# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **AMANDA McBAY,** *et al.***,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-11-S-3273-NE** |
| | ) | |
| **CITY OF DECATUR,** | ) | |
| **ALABAMA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Amanda McBay, Joanne Pearson, and Shannon Roberts, commenced this action seeking declaratory and injunctive relief pursuant to Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), and § 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq.* ("the Rehabilitation Act"), as well as the regulations implementing the ADA, 28 C.F.R. Part 35.[1]  The case currently is before this court on defendant's motion to dismiss plaintiffs' complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[2]  Due to the nature of plaintiffs' claim, and the City of Decatur's challenge to the constitutionality of the ADA, the United States was entitled to and elected to

---

[1] Doc. no. 1 (Complaint) ¶ 1.

[2] Doc. no. 4.

intervene.[3]  The government subsequently filed a brief in support of plaintiffs and as *amicus curiae*.[4]  Upon consideration of the complaint, motions, and briefs, this court concludes that defendant's motion is due to be granted in part and denied in part.

## I. LEGAL STANDARDS

### A.    Rule 12(b)(1):  Lack Of Subject Matter Jurisdiction

Federal district courts are tribunals of limited jurisdiction, "'empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution,' and which have been entrusted to them by a jurisdictional grant authorized by Congress."  *University of South Alabama v. The American Tobacco Co*., 168 F.3d 405, 409 (11th Cir. 1999) (quoting *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994)).  Accordingly, an "Article III court must be sure of its own jurisdiction before getting to the merits" of any action.  *Ortiz v. Fiberboard Corp*., 527 U.S. 815, 831 (1999) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 88-89 (1998)).

A motion to dismiss a case for lack of subject matter jurisdiction is governed by Federal Rule of Civil Procedure 12(b)(1).[5]  When ruling upon a Rule 12(b)(1)

---

[3] Doc. no. 10.

[4] *See* doc. no. 13 (United States' Motion to Participate as *Amicus Curiae*); doc. no. 13-1 (United States' Brief as Intervenor and *Amicus Curiae* in Opposition to Motion to Dismiss); doc. no. 19 (Order Granting United States' Motion to Participate as *Amicus Curiae*).

[5] Rule 12(b)(1) provides that "a party may assert the following defenses by motion:  (1) lack of subject-matter jurisdiction. . . ."  Fed. R. Civ. P. 12(b)(1).

motion asserting a lack of jurisdiction on the face of the plaintiff's complaint, the court must consider the allegations of the complaint as true.  *See Williamson v. Tucker,* 645 F.2d 404, 412 (5th Cir. 1981) (citations omitted).[6]

## B.    Rule 12(b)(6):  Failure To State A Claim Upon Which Relief Can Be Granted

Federal Rule of Civil Procedure 12(b)(6), which permits a party to move to dismiss a complaint for, among other reasons, "failure to state a claim upon which relief can be granted," must be read in conjunction with Rule 8(a), which requires that a pleading contain only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While that pleading standard does not require "detailed  factual allegations," *Bell Atlantic Corp. v. Twombly*, 544 U.S. 544, 550 (2007), it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).

> A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  [*Twombly*, 550 U.S., at 555].  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."  *Id*., at 557.

> To survive a motion to dismiss founded upon Federal Rule of Civil Procedure 12(b)(6), [for failure to state a claim upon which relief

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

3

can be granted], a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Id*., at 570.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  *Id*., at 556.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  *Ibid*.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id*., at 557 (brackets omitted).

Two working principles underlie our decision in *Twombly*.  *First*, the tenet that a court must accept as true all of the allegations contained in a complaint is *inapplicable to legal conclusions*.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  *Id*., at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)).  Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  *Second*, only a complaint that states a plausible claim for relief survives a motion to dismiss.  *Id*., at 556.  Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  490 F.3d, at 157-158.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not "show[n]" — "that the pleader is entitled to relief."  Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While *legal conclusions can provide the framework of a complaint, they*

> *must be supported by factual allegations. When there are well-pleaded*
> *factual allegations, a court should assume their veracity and then*
> *determine whether they plausibly give rise to an entitlement to relief.*

*Iqbal*, 556 U.S. at 678-79 (emphasis supplied).

When ruling on a motion to dismiss, the court must assume that all well-pleaded facts alleged in the complaint are true. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (1994) (stating that on a motion to dismiss, the court must "accept as true the factual allegations in the amended complaint"); *Marsh v. Butler County*, 268 F.3d 1014, 1023 (11th Cir. 2001) (*en banc*) (setting forth the facts in the case by "[a]ccepting all well-pleaded factual allegations (with reasonable inferences drawn favorably to Plaintiffs) in the complaint as true") (alteration supplied). Accordingly, the statements contained in the following part of this opinion as the relevant "facts" for Rule 12(b)(6) purposes may, or may not, be the actual facts. *See, e.g.*, *Williams v. Mohawk Industries, Inc.*, 465 F.3d 1277, 1281 n.1 (11th Cir. 2006).

## II. SUMMARY OF FACTS

Plaintiffs, Amanda McBay, Joanne Pearson, and Shannon Roberts, are Alabama residents who require a wheelchair for mobility and have limited use of their upper extremities.[7] Defendant, the City of Decatur, Alabama ("Decatur" or "the City"), is the owner, operator and/or lessee of the facilities, real properties, and improvements that

---

[7] Doc. no. 1 ¶¶ 3-5.

comprise Point Mallard Park ("Point Mallard").[8]  All three plaintiffs allege that they have visited Point Mallard and were "denied full, safe and equal access to the subject property due to [the City's] lack of compliance with the ADA."[9]  Each plaintiff also asserts that she "continues to desire and intends to visit [Point Mallard,] but continues to be denied full, safe and equal access due to the barriers to access which continue to exist."[10]

Plaintiffs assert that the barriers to access at Point Mallard cause the City to be in violation of the ADA, specifically Title II and various regulations under that Title of the Act.[11]  Plaintiffs also assert that the City is in violation of § 504 of the Rehabilitation Act and its underlying regulations.[12]  *See* 29 U.S.C. §794 *et seq*.; 34 C.F.R. §104 *et seq*.  To remedy these violations, plaintiffs seek a declaration that the City is in violation of the ADA and the Rehabilitation Act, an injunctive order directing the City to bring the facilities at Point Mallard into compliance with those acts, an injunctive order requiring the City to evaluate and neutralize its policies and procedures towards persons with disabilities, and reasonable fees and costs.[13]  Plaintiffs

---

[8] *Id.* ¶ 6.

[9] *Id.* ¶¶ 3-5 (alteration supplied).

[10] *Id.* (alteration supplied).

[11] *Id.* ¶¶ 8-27.  Plaintiffs identify thirty specific barriers to access and state that other barriers may be identified upon a full inspection of the premises.  *Id.* ¶¶ 24-25.

[12] Doc. no. 1 ¶¶ 28-34.

[13] *Id*. at 12 -14 (demands for relief).

also ask, with regard to their Rehabilitation Act claim, that the City be required to "undertake a self-evaluation" of its programs, policies, and practices that could affect individuals with disabilities, and to modify its policies, practices and procedures as necessary to eliminate discrimination against individuals with disabilities.[14]

## III. DISCUSSION

The City asserts that plaintiffs' claims should be dismissed for the following reasons:  (1) plaintiffs have not sufficiently pled standing to challenge the alleged barriers to access at Point Mallard; (2) plaintiffs lack standing to challenge deficiencies of which they are not yet aware; (3) Title II of the ADA cannot constitutionally be applied to the circumstances alleged in plaintiffs' complaint; (4) even if Title II of the ADA is constitutionally valid as applied, the regulatory provisions relied upon by plaintiffs are not susceptible to enforcement by means of private action; and (5) plaintiffs have inadequately pled their Rehabilitation Act claims.

### A.   Standing

The City's standing argument has two parts.  First, the City asserts that plaintiffs have not pled sufficient facts to establish standing.  Second, the City asserts that plaintiffs do not possess standing to assert claims for potential ADA violations that are not listed in the complaint, but may be discovered in the future.

---

[14] *Id*. at 14, ¶¶ (D)-(E).

### 1.      Sufficiency of pleading

To establish that she possesses standing, a plaintiff must demonstrate, among other things, that she has suffered an "injury-in-fact" as a result of the defendant's conduct or omissions. *See Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001).[15] The City asserts that plaintiffs have not pled sufficient facts to demonstrate that they have actually been injured by the City's alleged violations of the ADA.

Each plaintiff stated in the complaint that she

> visited the Defendant's premises at issue in this matter, and was denied full, safe and equal access to the subject properties of Defendant which are the subject of this lawsuit due to their lack of compliance with the ADA. [Plaintiff] continues to desire and intends to visit the Defendant's premises but continues to be denied full, safe and equal access due to the barriers to access which continue to exist.[16]

Plaintiffs also make the following allegations:

> 16.    Defendant's failure to adequately meet all of its obligations including, *inter alia*, to complete a Self-Evaluation, to develop a Transition Plan for modification of existing facilities, and to have fully implemented all structural modifications, has denied, and continues to deny, Plaintiffs full, safe and equal access to Defendant's programs, services and activities that are otherwise available to persons without disabilities at the Park.

> . . . .

---

[15] The other requirements are a casual connection between the plaintiff's injury and the defendant's conduct, and proof that the plaintiff's injury will be adequately redressed by a victory in the case. *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001).

[16] Doc. no. 1 ¶¶ 3-5 (alteration supplied). Plaintiffs also make similar allegations of being denied access in other paragraphs of the complaint. *See id.* ¶¶ 16, 17, 19, 21, 22.

8

19.   Plaintiffs were subjected to discrimination in attempts to access the programs, services and facilities operated and owned by Decatur.  Plaintiffs continue to desire to utilize Decatur's programs and services as well as return to the Park owned and operated by Decatur and therefore will continue to suffer discrimination by Decatur in the future.

. . . .

21.   Decatur has discriminated against Plaintiffs by denying full and equal enjoyment of benefits of a service, program or activity conducted by a public entity as prohibited by 42 U.S.C. § 12101 *et seq.*, and by failing to remove architectural barriers pursuant to 28 C.F.R. § 35.150(c).

22.   Defendant, Decatur has discriminated, and continues to discriminate against the Plaintiffs, and others who are similarly situated, by denying access to, and full and equal enjoyment of goods, services, facilities, privileges, advantages and/or accommodations of Decatur in derogation of Title II of the ADA, 42 U.S.C. § 12101 *et seq.*

23.   The Plaintiffs have been unable to and continue to be unable to enjoy access to the benefits of the programs, services and facilities owned, operated and/or leased by Decatur.[17]

Plaintiffs also list thirty examples of alleged deficiencies in the Point Mallard facilities that have allegedly caused the discriminatory denial of access to those facilities.  By way of example, plaintiffs allege:

(i)      At the water park, the accessible route leading to the entrances from the parking spaces designated as accessible are too steep and do not have handrails.

(ii)     The ticket counters leading into the water park are too high for a

---

[17] *Id.* ¶¶ 16, 19, 21-23.

wheelchair user.

(iii)   The second water park area has many accessible parking spaces
        that have signs that are too low to be viewed over parked vehicles.

(iv)    Most access aisles at parking spaces designated as accessible are
        too narrow.

(v)     At the ice skating rink, the parking spaces designated as accessible
        are not on the shortest accessible route to the entrance.[18]

The City asserts that those allegations are not sufficient because plaintiffs do not

explain exactly how the enumerated barriers to access have caused *them* to suffer any

injury under the ADA, and they do not specifically state whether they actually

encountered the alleged barriers during their visit(s) to Point Mallard.  The court

disagrees, because the injury to plaintiffs is plain, or at least easily inferred, from each

of the enumerated deficiencies.  *See Iqbal,* 556 U.S. at 678 ("A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the

*reasonable inference* that the defendant is liable for the misconduct alleged.")

(emphasis supplied).  For example, when plaintiffs state that the accessible route from

the parking spaces to the entrance to the water park is too steep and lacks handrails, the

obvious inference is that plaintiffs were unable to traverse that route due to the

steepness of the grade and the lack of handrails.  When plaintiffs state that the ticket

---

[18] *Id.* ¶ 24(i)-(v).

counters leading into the water park are too high for a wheelchair user, the obvious inference is that plaintiffs could not reach the ticket counters from their wheelchairs. Requiring plaintiffs to make explicit those obvious inferences would strain the concept of notice pleading, even under the additional requirements imposed by the *Twombly* and *Iqbal* decisions.

The primary case relied upon by the City — *Chapman v. Pier 1 Imports (U.S.), Inc.,* 631 F.3d 939 (9th Cir. 2011) — is only persuasive authority, and it is distinguishable.   In *Chapman*, the plaintiff merely attached to his complaint an "Accessibility Survey" that identified *all* of the defendant's violations of ADA regulations and the state building code "without connecting the alleged violations to Chapman's disability, or indicating whether or not he encountered any one of them in such a way as to impair his full and equal enjoyment of the Store." *Id.* at 954.  As such, the complaint did little more than "'perform a wholesale audit of the defendant's premises.'" *Id.* at 955 (quoting *Martinez v. Longs Drug Stores, Inc.*, No. CIV–S–03–1843 DFL CMK, 2005 WL 2072013, at (E.D. Cal. Aug. 25, 2005)).  The court was therefore left to "guess which, if any, of the alleged violations deprived [the plaintiff] of the same full and equal access that a person who is not wheelchair bound would enjoy when shopping at" the defendant's store. *Id.* at 955 (alteration supplied). Here, in contrast, plaintiffs did connect all of the alleged ADA violations at Point

11

Mallard to their disabilities, and they did indicate they had encountered all of the alleged deficiencies in a manner that deprived them of access to the Point Mallard facilities.  Accordingly, plaintiffs' ADA claim will not be dismissed for failure to plead sufficient facts to show that they possess standing.

## 2.      Standing to challenge unidentified violations

In addition to the thirty deficiencies identified in the complaint as resulting in ADA violations, plaintiffs state:

> There are other current barriers to access and violations of the ADA in Decatur which were not specifically identified herein as the Plaintiffs are not required to engage in a futile gesture pursuant to 28 C.F.R. § 36.501[19] and, as such, only once a full inspection is performed by Plaintiffs or plaintiffs' representatives can all said violations and barriers to access be identified.[20]

---

[19] This regulation provides, in pertinent part:

> Any person who is being subjected to discrimination on the basis of disability in violation of the Act or this part or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 303 of the Act or subpart D of this part may institute a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order.  Upon timely application, the court may, in its discretion, permit the Attorney General to intervene in the civil action if the Attorney General or his or her designee certifies that the case is of general public importance.  Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the civil action without the payment of fees, costs, or security.  *Nothing in this section shall require a person with a disability to engage in a futile gesture if the person has actual notice that a person or organization covered by title III of the Act or this part does not intend to comply with its provisions.*

28 C.F.R. § 36.501(a) (emphasis supplied).

[20] Doc. no.1 ¶ 25.

Plaintiffs also state, with regard to their Rehabilitation Act claim, that, "[u]pon information and belief, there are other current violations of the Rehabilitation Act in Decatur and only once a full inspection is performed by Plaintiffs or Plaintiffs' representatives can all said violations be identified."[21]   Plaintiffs later clarified in briefing that they are not seeking any relief from the City of Decatur that extends beyond the facilities at Point Mallard.[22]

The City argues that plaintiffs do not have standing to assert claims for potential ADA violations that may be discovered in the future, but are not currently listed in the complaint.  The City relies upon the Eleventh Circuit's unpublished decision in *Norkunas v. Seahorse NB, LLC*, 444 F. App'x 412 (11th Cir. 2011).  In that case, the disabled plaintiff asserted several deficiencies in the defendant's hotel property, including certain deficiencies in the hotel's accessible guestrooms.  *See Norkunas v. Seahorse NB, LLC*, 720 F. Supp. 2d 1313, 1320 (M.D. Fla. 2010).  Because the plaintiff did not actually stay in an accessible room, however, the district court found that he did not have standing to assert that the accessible rooms were non-ADA-compliant.  *Id.*   The court reasoned that, without knowledge of the barriers in the

---

[21] *Id.* ¶ 34 (alteration supplied).

[22] *See* doc. no. 9 (Plaintiffs' Response to Motion to Dismiss and Memorandum of Law), at 14 n.2 ("[I]t is not Plaintiffs' intent to expand the scope of this case beyond Point Mallard Park or beyond those specific facilities mentioned in Plaintiffs' Complaint which plaintiffs believe to be part of Point Mallard Park.") (alteration supplied).

accessible rooms, a plaintiff "has not suffered an 'injury in fact' which establishes standing at the time of filing the complaint." *Id.* at 1319 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  The district court acknowledged that courts in other Circuits had held that "a plaintiff need not encounter all barriers nor have knowledge of all barriers to obtain relief." *Id.* at 1319 n.14 (citing *Steger v. Franco, Inc.*, 228 F.3d 889, 894 (8th Cir. 2000); *Pickern v. Holiday Quality Foods*, 293 F.3d 1133, 1138 (9th Cir. 2002)).  Even so, the district court found that "courts in the Eleventh Circuit have been more cautious, requiring a showing of plaintiff's actual knowledge of particular barriers for the plaintiff to have standing to challenge those barriers." *Id.* (citing *Access Now, Inc. v. S. Fla. Stadium Corp.*, 161 F. Supp. 2d 1357, 1365 (S.D. Fla. 2001); *Fox v. Morris Jupiter Assocs.*, No. 05-80689-CIV, 2007 WL 2819522, at *6 (S.D. Fla. Sept. 21, 2007)).

The Eleventh Circuit affirmed that decision on appeal.  The plaintiff argued to the Eleventh Circuit that "the statutory language of the ADA allows for standing to bring an entire facility into compliance once one barrier is encountered," but the Eleventh Circuit explicitly rejected that construction of the statute. *Norkunas*, 444 F. App'x at 416.  Instead, the Circuit panel held that, because the plaintiff "did not experience discrimination as a result of his stay in a designated accessible room, he was not discriminated against through barriers contained therein and he does not meet

14

the injury in fact requisite for standing." *Id.*

Even though the *Norkunas* decision is unpublished and, therefore, not binding, this court concludes that it should be followed because it is clear, well-reasoned, and consistent with decisions from most other courts within the Eleventh Circuit. Under *Norkunas*, plaintiffs do not have standing to raise violations of the ADA and Rehabilitation Act that they have not yet experienced. The claims sought to be asserted in paragraphs 25 and 34 of plaintiffs' complaint, therefore, are due to be stricken.

As another judge from this district has noted in a similar case, however, this ruling "in no way limits [plaintiffs'] ability to amend [their] complaint."[23] If plaintiffs later encounter additional barriers to access at Point Mallard, they may seek leave to amend their complaint to encompass those barriers, and leave will be freely given as justice requires. *See* Fed. R. Civ. P. 15(a)(2).

## B.    Rehabilitation Act Claim

The court will next address the City's argument that plaintiffs' Rehabilitation Act claim must fail because they did not adequately allege that any particular City departments, agencies, entities or other instrumentalities receive federal funding.[24]

---

[23] Doc. no. 14 in *James Mason v. Redstone Ridge, LLC,* Civil Action No. 5:12-cv-1685-AKK, at 5 (alterations supplied).

[24] As the United States, appearing in the capacities of intervenor and *amicus curiae*, points out, "the existence of a valid Section 504 claim renders it unnecessary for the Court to consider at this time the city's arguments regarding the constitutionality of Title II." Doc. no. 13-1 (United States' Brief as Intervenor and *Amicus Curiae* in Opposition to Motion to Dismiss), at 4. More

Section 504 of the Rehabilitation Act states, in the part pertinent to the following discussion, that:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any *program or activity receiving Federal financial assistance* . . . .

29 U.S.C. § 794(a) (emphasis supplied).  The statute defines the term "program or activity" as including

> all of the operations of —
>
> (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
>
> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government . . .
>
> any part of which is extended Federal financial assistance.

29 U.S.C. § 794(b).  The former Fifth Circuit has held, in the context of interpreting the phrase "program or activity receiving Federal financial assistance," that

> it is not sufficient, for purposes of bringing a discrimination claim under section 504, simply to show that some aspect of the relevant overall entity

---

specifically, the United States states that "[t]he city's obligations are the same pursuant to Section 504 and Title II, and so as long as [*sic*] the plaintiffs maintain a live Section 504 claim, the constitutionality of Title II is a purely academic question that should not be decided."  *Id.* at 7 (alterations supplied).

16

or enterprise receives or has received some form of input from the federal
fisc.  A private plaintiff in a section 504 case must show that the program
or activity with which he or she was involved, or from which he or she
was excluded, itself received or was directly benefitted by federal
financial assistance.

*Brown v. Sibley,* 650 F.2d 760, 769 (5th Cir. 1981).[25]

In their complaint in the present case, plaintiffs allege only that "[d]efendant is
the direct recipient of federal funds sufficient to invoke the coverage of Section 504,
and is unlawfully and intentionally discriminating against Plaintiffs on the sole basis
of the disabilities of Plaintiffs."[26]  Plaintiffs never specify any particular City program
or activity that receives federal funds; and, even more importantly, they never state that
any such program or activity actually caused the Rehabilitation Act violations at issue
here.  Without even a bare allegation that they actually were discriminatorily affected
by a specific program or activity that receives federal financial assistance, plaintiffs
cannot support a claim under the Rehabilitation Act.

## C.   As-Applied Constitutional Challenges to the ADA

---

[25] As recently as 2011, the Eleventh Circuit has indicated that it intends to abide by the
principles set forth in *Brown.  See Muckle v. UNCF*, 420 F. App'x. 916, 918 (11th Cir. 2011).
Moreover, plaintiffs do not appear to challenge that *Brown* contains the proper standard.  *See* doc.
no. 9 (Plaintiffs' Response to Motion to Dismiss and Memorandum of Law), at 37-38 ("While
Defendant may correctly be arguing that Plaintiffs will ultimately have the burden of proving that
individual departments and/or programs of the Defendant actually received federal funds sufficient
to invoke application of the Rehabilitation Act to Point Mallard Park, that argument is no basis for
dismissal at this juncture.").

[26] Doc. no. 1 ¶ 31 (alteration supplied).

The ADA was enacted in 1990 with the stated purpose of creating "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).  Title II of the Act governs discrimination in the provision of public services, and states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the *services, programs, or activities of a public entity*, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis supplied).   The term "public entity" includes "any State or local government," as well as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1).

A private plaintiff alleging a violation of Title II has the burden of proving three *prima facie* elements:

> (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

*American Association of People with Disabilities v. Harris*, 647 F.3d 1093, 1101 (11th Cir. 2011) (quoting *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1083 (11th Cir. 2007)).  When passing the ADA, Congress stated its specific intent "to invoke the sweep of congressional authority, *including the power to enforce the fourteenth*

*amendment and to regulate commerce*, in order to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4) (emphasis supplied). Despite that clear statement of Congressional intent, the City challenges the application of Title II in this case as an invalid exercise of Congressional power, both under the Fourteenth Amendment and the Commerce Clause.

Notably, the City is not asserting immunity under the Eleventh Amendment.[27] While the relevant case law regarding the constitutionality of the ADA is often triggered by assertions of immunity, the question of whether Congress had "the power to abrogate the states' immunity from suit is a different question from whether the substantive provisions of the ADA are a valid exercise of Congress's power." *Nelson v. Miller*, 170 F.3d 641, 648 (6th Cir. 1999). Even so, the ADA cases triggered by an Eleventh Amendment challenge are still instructive.

The test for valid abrogation of a state governmental entity's immunity under the Eleventh Amendment is a two-step process. First, the court must ask whether Congress intended to abrogate state immunity. *University of Alabama v. Garrett*, 531 U.S. 356, 363 (2001). If so, the second question is whether the act was "pursuant to a valid grant of constitutional authority." *Id.* (quoting *Kimel v. Florida Board of*

---

[27] Doc. no. 12 (Reply of City of Decatur, Alabama, in Support of Motion to Dismiss), at 12 ("This, however, is not a case in which sovereign immunity has been claimed . . . .").

*Regents*, 528 U.S. 62, 73 (2000).  Even though immunity is not at issue in the present case, it still is necessary to determine whether Congress validly enacted the ADA pursuant to "one or more of its powers enumerated in the Constitution." *United States v. Morrison*, 529 U.S. 598, 607 (2000).  The two potential bases of enumerated powers at issue this case are the Commerce Clause of Article I,[28] and Section 5 of the Fourteenth Amendment:  its enforcement provision.[29]

### 1.    Fourteenth Amendment

When invoking the Fourteenth Amendment as a basis for enacting the ADA, Congress was utilizing its enforcement power under Section 5 of that Amendment, which provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article."  The Supreme Court has acknowledged that Section 5 is "a positive grant of legislative power." *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966). Congress is thus given the power to promulgate laws prohibiting or providing remedies for "constitutional violations . . . even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'" *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976)).  The Court has thus

---

[28] U.S. Const. art. I, § 8, cl. 3 ("Congress shall have Power To . . . regulate Commerce with foreign nations, and among the several States, and with the Indian Tribes; . . .") (1787).

[29] U.S. Const. amend. XIV, § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.") (1868).

20

interpreted Section 5 as giving Congress a broad scope of power:

> Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.

*Boerne*, 521 U.S. at 517-518 (internal citations omitted).

Even so, the power granted to Congress by Section 5 is not without limitations. "Congress does not enforce a constitutional right by changing what the right is.  It has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation." *Id.* at 519.  In short, this power is "remedial," not substantive. *See id.*  The test which the Supreme Court has adopted to determine whether legislation is remedial or substantive is one of "congruence and proportionality." *Id.* at 520 ("There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.").  That test implicates three issues for analysis by a court in the context of a challenge to the validity of the ADA, *i.e.*:

> (1) the constitutional right or rights that Congress sought to enforce when it enacted the ADA; (2) whether there was a history of unconstitutional discrimination to support Congress's determination that prophylactic legislation was necessary; and (3) whether Title II is an appropriate response to this history and pattern of unequal treatment.

*Association for Disabled Americans, Inc. v. Florida International University*, 405

F.3d 954, 957 (11th Cir. 2005) (hereinafter "*FIU*") (quoting *Garrett*, 531 U.S. at 365-370).  Additionally, a court applying the test must "consider the harm to be prevented on a 'claim-by-claim basis.'" *Gaylor v. Georgia Department of Natural Resources*, No. 2:11–CV–288–RWS, 2012 WL 3516489, *3 (N.D. Ga. Aug. 15, 2012) (quoting *United States v. Georgia*, 546 U.S. 151, 159 (2006)).

The City has elected not to present a substantive argument on the second issue generally addressed by a court in the context of a challenge to the constitutionality of the ADA — *i.e.,* whether there was a history of unconstitutional disability discrimination to support Congress's determination that prophylactic legislation was necessary.[30]  Thus, the court will discuss only the first and third factors.  For the beginning step of the analysis — *i.e.,* determining " the constitutional right or rights that Congress sought to enforce" — there are two relevant categories of cases.  The first category, encompassing those cases in which the plaintiff "seeks to enforce the Fourteenth Amendment's 'prohibition on irrational discrimination,'" are examined under rational basis review.  *FIU*, 405 F.3d at 957.  Naturally, all valid claims under

---

[30] Doc. no. 5 (City's Brief in Support of Motion to Dismiss), at 25 ("The Eleventh Circuit has at times interpreted *dicta* from the Supreme Court's decision in *Lane* to imply that the second step of the *Flores* inquiry has been conclusively met. . . .  Because it is not necessary to make a contrary assumption in order to demonstrate the unconstitutionality of a Title II cause of action in the circumstances of this case, below, the City skips over the historical component of the inquiry and focuses on the nature of the right sought to be protected and the absence of congruence and proportionality between that right and the chosen congressional remedy.").

Title II of the ADA will include discrimination against a disabled plaintiff and, thus, will trigger at least rational basis review.  The second category of authorities, however, narrows the first category to a smaller field of cases involving disability discrimination that inherently impacts heightened constitutional rights, thereby requiring a "more searching judicial review." *Id.* (citing *Tennessee v. Lane*, 541 U.S. 509, 539 (2004)). For example, the *Lane* case addressed access barriers that prevented disabled persons from taking part in court proceedings — barriers that, in turn, affected their fundamental rights under the Due Process and Confrontation Clauses.  *Lane,* 541 U.S. at 530; *see also FIU,* 405 F.3d at 957.  The holding in *Lane* was explicitly limited "to the class of cases implicating the accessibility of judicial services." *Lane*, 541 U.S. at 530.

It is true that other circuits and districts have narrowed the scope of valid Title II claims solely to those implicating a fundamental right.  Even so, the Eleventh Circuit has not followed that path. In *FIU*, the Eleventh Circuit upheld the ADA under Section 5 "as applied to access to public education." *FIU,* 405 F.3d at 958.  The court admitted that public education is not a "fundamental right," but nevertheless distinguished it from other rights that warrant only rational basis review by characterizing public education as "vital to the future success of our society." *Id*.  The Eleventh Circuit's decision in *FIU* is consistent with the Supreme Court's holding in *United States v.*

*Georgia,* 546 U.S. 151 (2006).  There, the Court found that Section 5 validly created private remedies for actual Fourteenth Amendment violations, but it left open the question of whether claims for Title II violations that did *not* independently violate the Fourteenth Amendment were "nevertheless valid." *Id.* at 159.  Additionally, the Supreme Court has recognized that Congress's Section 5 power allows it to prohibit "a somewhat broader swath of conduct, including that which is not itself forbidden by the [Fourteenth] Amendment's text." *Kimel v. Board of Regents*, 528 U.S. 62, 81 (2000) (alteration supplied).  Thus, this court concludes that Congress intended for the scope of the ADA to reach past solely fundamental rights.

In the present case, plaintiffs allege Title II violations with regard to a water park, parking spaces, ice skating rink, campgrounds, picnic area, sports field, recreation center, and swimming pools.[31]  There is much debate in the parties' briefs as to whether these facilities should be considered "entertainment and recreation" facilities (as suggested by the City), or forums for exercising the rights to assembly, association, and speech (as suggested by plaintiffs), or merely part of the broad category of "public facilities" (as suggested by the United States).  It is not necessary to resolve that debate, however, because, as discussed below, even if the facilities at issue are characterized as "entertainment and recreation" and, therefore, deserving of only

---

[31] Doc. no. 1 ¶ 24.

rational basis review, they still survive scrutiny under the "congruence and proportionality" test.  *See, e.g., Boerne*, 521 U.S. at 520.

The next question is whether Title II, as applied to issues of equal access to entertainment and recreational venues, is an appropriate remedial measure for the history of unconstitutional discrimination identified in the statute.  The right to equal access in entertainment and recreational settings is not as compelling as the right to equal access to the courts, governmental administration and service facilities, or even safe public transportation routes.  Even so, Congress still addressed discrimination against people with disabilities in the realm of recreational and entertainment venues during the drafting of the ADA, albeit primarily in connection with Title III, which applies to *private* accommodations.[32]  The facilities at issue here do not fall under Title III, because they are *public* facilities.  Nevertheless, they serve functions that are similar to the privately owned facilities addressed in Title III.[33]  It would be illogical for Congress to prevent disability discrimination in privately owned accommodations, yet allow it to occur at the hands of local governments providing similar programs in

---

[32] Title III applies to "private entities" such as hotels, restaurants, theaters, convention centers, retail stores, service establishments, public transportation hubs, museums, libraries, parks, zoos, private schools, social service centers, and exercise facilities. *See* 42 U.S.C. § 12181 (7). In contrast, Title II applies to public entities.

[33] For example, it is logical to infer that Point Mallard, if privately-owned, would be "a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation," as defined within Title III of the ADA.  *See* 42 U.S.C. § 12181(7)(L).

25

similar public locations.  Moreover, that logical inconsistency would contradict the stated purpose of the ADA — that of creating a "'clear and comprehensive national mandate' to eliminate discrimination against disabled individuals, and to integrate them 'into the economic and social mainstream of American life.'" *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (quoting S.Rep. No. 101-116, p. 20 (1989); H.R.Rep. No 101-485, pt. 2, p. 50 (1990)).  Further, because Title II only applies to remedy "irrational discrimination," and allows for great flexibility in determining the extent of the "reasonable modifications" required by the implementing regulations, a public entity like defendant is not unduly burdened by the statute's remedial requirements. Indeed, Congressional investigations into the potential costs of Title II compliance have found that retrofitting older facilities does not have to be expensive,[34] and that building new facilities to be accessible is not a burden either.[35]  Thus, this court finds that, as applied to entertainment and recreational venues like those described in plaintiffs' complaint, Title II is a congruent and proportional exercise of Congressional

---

[34] "Numerous inexpensive changes can be made to make a facility accessible, including installing a permanent or portable ramp over an entrance step; installing offset hinges to widen a doorway; relocating a vending machine to clear an accessible path; and installing signage to indicate accessible routes and features within facilities." H.R.Rep. No 101-485, pt. 2, p. 35-36 (1990).

[35] "Several witnesses also recognized that newly constructed build-ups should be fully accessible because the additional costs for making new facilities accessible are often nonexistent or negligible. According to Michael Oestreicher, who directs an architectural firm that designs barrier-free environments, there is absolutely no reason why new buildings constructed in America cannot be barrier-free since additional cost is not a significant factor." H.R.Rep. No 101-485, pt. 2, p. 36 (1990).

power under Section 5.  *See, e.g., Boerne*, 521 U.S. at 520.

### 2.    Commerce Clause

Because this Court has found that Title II, as applied to plaintiffs' claims, is a

valid exercise of Section 5 enforcement power under the Fourteenth Amendment, there

is no need to determine Title II's constitutionality under the Commerce Clause of

Article I of the United States Constitution.  "A fundamental and longstanding principle

of judicial restraint requires that courts avoid reaching constitutional questions in

advance of the necessity of deciding them." *Randall v. Scott*, 610 F.3d 701, 710 (11th

Cir. 2010) (quoting *Lyng v. Northwest Indian Cemetery Protective Ass'n.*, 485 U.S.

439, 445 (1988)).

### D.    Private Right of Action

Defendants also argue that, even if the ADA is a valid exercise of Congressional

power, the "plaintiffs' claims must be dismissed to the extent that they are based upon

or attempt to rely upon technical, abstract violations" of the regulations promulgated

by the United States Attorney General for the purpose of implementing the ADA.[36]  It

has been recognized that a regulation can "be enforced through the private right of

action available under the organic statute that it implements." *Iverson v. City of Boston*,

452 F.3d 94, 100 (1st Cir. 2006) (citing *Alexander v. Sandoval*, 532 U.S. 275, 284-285

---

[36] Doc. no. 5, at 48.

(2001)).  That application is limited, however, and excludes private enforcement actions based upon "regulations that go beyond what the statute itself requires." *Sandoval*, 532 U.S. at 293 n. 8.  As the Sixth Circuit has observed,

> a private plaintiff cannot enforce a regulation through a private cause of action generally available under the controlling statute if the regulation imposes an obligation or prohibition that is not imposed generally by the controlling statute. On the other hand, if the regulation simply effectuates the express mandates of the controlling statute, then the regulation may be enforced via the private cause of action available under that statute.

 *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004).

The Eleventh Circuit has applied the foregoing principles to bar any "freestanding private right of action to enforce a statute's implementing regulation unless Congress has clearly indicated, expressly or impliedly, to the contrary." *American Association of People with Disabilities v. Harris,* 605 F.3d 1124, 1133 (11th Cir. 2010) ("*Harris I*"), *opinion vacated upon rehearing on other grounds by American Association of People with Disabilities v. Harris,* 647 F.3d 1093 (11th Cir. 2011) ("*Harris II*").[37]  The Eleventh Circuit's opinion in *Harris I* noted the specific provision of an enforcement remedy in the statutory language of the ADA itself, finding that "[t]he regulations, by contrast, interpret and define the scope of the ADA," rather than

---

[37] While *Harris* has been vacated on re-hearing on other, factually-related grounds, the reasoning on this point is still valid and persuasive.

28

provide any sort of private right of action that is already present in the statute. *Id.* (alteration supplied).

The First, Sixth, and Ninth Circuits reached the same conclusion, and based their opinions on *Sandoval*. *See Iverson*, 452 F.3d at 100; *Ability Center*, 385 F.3d at 913; *Lonberg v. City of Riverside*, 571 F.3d 846 (9th Cir. 2009).  In *Ability Center v. Sandusky*, the plaintiffs asserted two ADA claims:  failure to install accessible curb ramps on renovated sidewalks; and, failure to apply the transition plan required by ADA regulations.  *Ability Center,* 385 F.3d at 902.  The Sixth Circuit, applying *Sandoval*, found that the defendant's failure to install accessible curb ramps when renovating streets and sidewalks gave rise to a valid claim for violation of the ADA, because the statutory language contemplated such injuries and remedies. *Id.* at 913.  The court dismissed the plaintiffs' second claim, however, finding the defendant's failure to "develop a transition plan in violation of § 35.150(d) does not in and of itself similarly hinder the disabled." *Id.* at 914.

The Ninth Circuit agreed with the Sixth Circuit's reasoning, and denied the claim of a plaintiff who was attempting to enforce the transition plan required by 28 C.F.R. § 35.150(d). *Lonberg*, 571 F.3d at 852.

The First Circuit also denied a claim based on the transition plan regulation, as well as a claim of violation based on the ADA regulatory self-evaluation plan.  *See*

*Ability Center*, 452 F.3d at 101.  That court pointed out the "important distinction" between claims that allege "violations of, and [a] concomitant right to enforce, the self-evaluation and transition plan regulations," on the one hand, and a claim asserting "a direct violation of Title II," on the other.  *Id.* at 100 (alteration supplied).

Therefore, the task for this court is to determine whether plaintiffs' claims are based upon "express mandates of the controlling statute," *Ability Center,* 385 F.3d at 907, or "go beyond what the statute itself requires." *Sandoval*, 532 U.S. at 293 n. 8.

Like the plaintiffs in *Iverson*, the plaintiffs in the present case have based their claims on a mixture of the ADA regulations promulgated by the Attorney General, and remedies expressly provided in the statute itself.  Plaintiffs reference both the transition plan and the self-evaluation required by 28 C.F.R. § 35.105, and claim that the City's failure to develop and implement those plans has denied them their rights to equal access under the ADA.[38]  As with similar claims addressed by the previously cited opinions of the First, Sixth, and Ninth Circuits, this part of the plaintiffs' claim in the present case is not enforceable as a private right of action.  Even so, the plaintiffs' ADA claim is not based solely on those regulations. Plaintiffs also allege the City's failure to complete required structural changes needed for "equal program, service, or

---

[38] Doc. no. 1 ¶¶ 11-13.

activity access,"[39] and they claim discrimination "as prohibited by 42 U.S.C. §12101 *et seq*., and by failing to remove architectural barriers pursuant to 28 C.F.R. § 35.150(c)."[40]  While the lack of a self-evaluation or transition plan does not directly harm plaintiffs, defendant's failure to make reasonable modifications to eliminate or ameliorate structural barriers to equal access does directly harm plaintiffs in a manner anticipated by Title II.  This court agrees with the Sixth Circuit's conclusion that "Title II contemplates that such accommodations must sometimes come in the form of public entities removing architectural barriers that impede disabled individuals from securing the benefits of public services." *Ability Center*, 385 F.3d at 907.[41]  As a consequence, this court concludes that plaintiffs possess a valid and enforceable private right of action for those alleged violations of the ADA that fall under the express mandate of the statute.

For the foregoing reasons, plaintiffs' claim for a violation of Title II of the ADA is enforceable in this private cause of action as it pertains to the express mandate of Title II.  Plaintiffs' claim cannot be based on either the self-evaluation or transition

---

[39] *Id*. ¶ 14.

[40] *Id*. ¶ 21.  28 C.F.R. §35.150(c) demands that structural changes undertaken to existing facilities must be made either within three years of January 26, 1992, or "as expeditiously as possible."

[41] The Sixth Circuit, in *Ability Center*, found 28 C.F.R. §35.151 to be enforceable through a private cause of action. This regulation requires new construction and alternations to existing construction to be made accessible.

plan regulations promulgated by the Attorney General, but the lack of compliance with those regulations can, nevertheless, be cited as evidence of overall ADA non-compliance.  In their request for relief, plaintiffs ask the court to direct defendant "to evaluate and neutralize its policies and procedures . . . to allow Defendant to undertake and complete corrective procedures."[42]  To the extent that plaintiffs are requesting this court to order compliance with the transition plan and self-evaluation regulations referenced in the complaint, the request is denied.  Even so, plaintiffs' claim is properly based on their allegations of discrimination in equal access and defendant's failure to reasonably modify structural barriers.

## IV CONCLUSION AND ORDERS

In accordance with the foregoing, defendant's motion to dismiss is GRANTED in part and DENIED in part.  Plaintiffs' Rehabilitation Act claim (Count II) is DISMISSED with prejudice.  The claims sought to be asserted in paragraphs 25 and 34 of the complaint also are stricken and DISMISSED, but without prejudice to plaintiffs' right to amend their complaint to add additional violations that may be discovered in the future.  The motion to dismiss is DENIED as to all other aspects of plaintiffs' ADA claim (Count I).

The stay on discovery is lifted, and the parties are ORDERED to proceed with

---

[42] Doc. no. 1, at 14 ¶ (C).

discovery pursuant to the Uniform Initial Order that will be entered contemporaneously herewith.  The parties must submit a report of their discovery planning conference on or before April 25th, 2014.

DONE and ORDERED this 11th day of April, 2014.

_____
United States District Judge

33